Statement of the Case.
MONROE, C. J.
This is an appeal by defendant from a judgment awarding plaintiffs $2,066.67, with interest, as a fee for services as attorneys at law, extending over a period of more then six years and resulting in the establishment of defendant’s title to land, worth then, and now, in excess of $40,000.
The petition is that of a law partnership, domiciled in Shreveport and composed of James A. Thigpen and Sidney L. Herold, and it alleges an indebtedness, by defendant, of $2,500, with interest, and proceeds, by paragraphs, as follows:
_ “That the aforesaid sum is due to your petitioner by the said J. B. Slattery for services rendered to the said J. B. Slattery as his attorneys in the state and federal courts and in proceedings before the register and receiver of the United States Land Office at Baton Rouge, La., the Commissioner of the General Land Office of the United States, and the Secretary of the Interior Department of the United States at Washington, D. C., during a period beginning November 14, 1908, and terminating February 19, 1915. * * *
“Paragraph 3.
“That the history of the aforesaid proceedings and the events leading up to the employment of your petitioner as attorneys for the aforesaid J. B. Slattery are as follows:
“In 1857, the state of Louisiana selected, as swamp and overflow land, the E-. % of the S. W. % of .section 7, township 17 north, range 13 west, in Caddo parish, La. The state of Louisiana having granted and issued a patent to the above-described property, the title passed from the original patentee by mesne conveyance to the aforesaid J. B. Slattery; Slattery’s title being undisputed until the year 1900, when the selection by the state, in 1857, was rejected by the Secretary of the Interior, thus vitiating the state’s title. From this decision of the Secretary of the Interior no appeal was taken by the state, and on September 16, 1908, one W. H. Matthews filed a homestead entry on the above-described property. In the latter part of 1908, your petitioner was employed by J. B. Slattery to contest Matthews’ homestead entry and to secure for Slattery a valid title, and, in accordance with this employment, your petitioner, 'in July, 1909, obtained the consent of the Govern- or of the state of Louisiana and the register of the state land office to file an application, in the name of the state with the Secretary of the Interior to set aside the aforesaid rejection of the state’s title and to reopen the case before the secretary,, and filed the application shortly after-wards. Your petitioner then filed an intervention for J. B. Slattery in these proceedings instituted in the name of the state and caused the aforesaid Matthews to be made a party to the proceedings.
“Upon consideration of the application to reopen the ease and reconsider the rejection of the state’s title to the aforesaid property, the Secretary of the Interior rendered a decision remanding and referring the entire matter to the register and receiver with the instructions to permit the state of Louisiana and the intervener, J. B. Slattery, to file contests to the application and homestead entry of W. H. Matthews and to set up the claims of the state and of the intervener, J. B. Slattery, to the aforesaid property; all of which was done by your petitioner both in the name of the state and in the name of the aforesaid J. B. Slattery.
“In the meantime, the aforesaid W. H. Matthews had taken physical possession of the aforesaid land, and your petitioner, thereupon, in behalf of the aforesaid J. B. Slattery, secured an injunction from the First judicial district court, of Caddo parish, enjoining Matthews from trespassing on the aforesaid property, as shown by proceedings had in suit No. 12485 on the docket of this honorable court, all of the proceedings had in which and the entire record of which suit are by reference hereto annexed and made part hereof.
“On November 14, 1908, Matthews instituted an action of jactitation, this suit being entitled Matthews v. Slattery, No. 12511, on the docket of this honorable court.
“Your petitioner, acting as attorneys for the aforesaid J. B. Slattery, at first filed a petition to remove this case to the federal court, but subsequently withdrew the petition, abandoned the proceedings in the federal court, and plaped the case at issue. The case was decided in favor of the aforesaid J. B. Slattery by this honorable court, the judgment of this honorable court being affirmed by the Supreme Court of Louisiana, upon appeal, as shown by the proceedings had in the case of Matthews v. Slattery, No. 17619, on the docket of the Supreme Court of Louisiana, *711 [1] tie proceedings in which and record of which are by reference hereto annexed and made part hereof.
“In 1910, your petitioner tried the contest of Matthews’ homestead entry before the register and receiver of the United States Land Office, and on September 17, 1910, said register and receiver rendered judgment on the contest, canceling Matthews’ homestead entry and finding as a fact that the contention of your petitioner, made in behalf of the state and of the aforesaid J. B. Slattery, as to the aforesaid land being swamp and overflow land, was correct.
“Upon appeal taken by Matthews, the Commissioner of the General Land Office affirmed the judgment of the register and receiver in so far as it canceled the homestead entry of Matthews, but held that the state was precluded from claiming the aforesaid lands as swamp and overflow land by reason of its not having taken an appeal from the decision of the Secretary of the Interior in 1900; this decision of the Commissioner of the General Land Office being rendered about March 4, 1912. At this stage of the proceedings, your petitioner found it necessary to have the assistance of an attorney in Washington, D. C., and, with the consent and by the authority of the aforesaid J. B. Slattery, employed Mr. Frederick E. Chapin for this purpose, at an agreed fee of $1,500.
“Tour petitioner then appealed from the decision of the Commissioner of the General Land Office to the Secretary of the Interior, and on July 3, 1913, the secretary rendered a decision reversing the decision of the Commissioner of the General Land Office and remanding the case to the commissioner with the instructions to hear evidence and readjudge on the question of the state’s title to the land as swamp and overflow land.
“Upon rehearing before the Commissioner of the General Land Office, a judgment was rendered by the commissioner, under date of April 1,1914, rejecting the claim of the state of Louisiana, and of J. B. Slattery, holding under the state, to the land aforesaid, from which judgment an appeal was again taken by your petitioner, both in behalf of the state of Louisiana and in behalf of J. B. Slattery, to the Secretary of the Interior. On this appeal, and after argument of the case, the Secretary of the Interior, on September 17, 1914, rendered a final decision, again reversing the decision of the Commissioner of the General Land Office, sustaining the claim of the state to the aforesaid land as swamp and overflow land and ordering a patent to issue.
“The Governor of the state of Louisiana, by suggestion of your petitioner, then requested the issuance of the patent, and on February 19, 1915, the patent was issued by the United States, thus perfecting the title of J. B. Slattery to the aforesaid land.
“Paragraph 4.
“That the value of the aforesaid land was, at the time the aforesaid services were rendered, and is now, in excess of the sum of $40,000.
“Paragraph 5.
“That, at the time your petitioner was employed by the aforesaid J. B. Slattery, there was no agreement or understanding between your petitioner and the aforesaid J. B. Slattery as to the amount of the fee to be paid your petitioner for the services to be rendered, but that your petitioner understood that the aforesaid J. B. Slattery would pay to your petitioner a reasonable compensation, based on the value of the services rendered and on the value of the land the title to which was involved in the aforesaid proceedings.
“Paragraph 6.
“That the services rendered by your petitioner as aforesaid, extending over a period of more than six years, are well worth the sum of $3,000.
“Paragraph 7.
“That the aforesaid J. B. Slattery has paid to the aforesaid Frederick E. Chapin the sum of $1,500 for the services rendered by the said Frederick Chapin, of which amount the said Frederick E. Chapin voluntarily remitted one-third as a forwarding fee to your petitioner, for which remittance your petitioner is willing to credit the indebtedness of the aforesaid J. B. Slattery to the extent of $500, leaving a balance due your petitioner, as aforesaid, of $2,500.
“Paragraph 8.
“That the aforesaid indebtedness is past due and unpaid, and that the said J. B. Slattery refuses to pay the same, although your petitioner has made due demand upon him for the payment thereof.”
Defendant “admits that the history of the case, as set np herein, is substantially correct.” He admits that the value of the land in question, at the times the services were rendered, and now, was and is in excess of $40,000. He admits that there was no agreement between plaintiffs and himself as to their fee, or as to whether they were to charge a fee; but he denies that they understood, or had any reason to understand, that any fee would be paid, “as defendant was a member of the firm of Slattery & Slattery, attorneys at the Shreveport bar, and there was a well-established custom * * * that attorneys representing each other in mat *713 ters of litigation accepted no fees and charged none; * * * that such custom was well known to said plaintiff; * * * that said plaintiff, knowing this custom and knowing that defendant did not expect to pay a fee for such services as were to be rendered, should have notified defendant that a fee would be expected, and thus have given him an opportunity of securing the services of other attorneys who would have charged no fee.”
It appears from the evidence that, before bringing suit, plaintiffs presented to defendant a bill of $1,000 in a letter of October 1, 1914, in which they said (after requesting defendant to send them a check to be remitted to Mr. Chapin, pursuant to defendant’s contract with him):
“In this connection, permit us to call your attention to the great amount of work which we have performed in this matter, covering the past six years. * * * While we have no express agreement with you relative to the amount of the fee to be paid us in the case, we have no doubt that you will consider a charge of $1,000 as not only being moderate, under the circumstances, but as evidencing also the fact that we have taken into consideration our personal feelings for you rather than the value of the property involved.”
Something more than a year later (December 18, 1915), plaintiff addressed another letter to defendant, reading, in part, as follows:
“Inasmuch as your evident disposition is to deny any obligation or liability for our professional services, * * * we withdraw the bill which we previously sent you. This bill, as you know, * * * did not represent the value of our legal services, but was a nominal bill. If, however, the spirit in which this bill was rendered is not appreciated, and if you desire to take issue with us upon the questions of liability, we will insist upon such payment being made as would be fair and adequate compensation for the services performed. The amount of this fee we are prepared to leave to the judgment of any three lawyers of this bar — one, to be selected by you, and one, by us, and the third, to be selected by these two, should they disagree.”
A dozen members of the Shreveport bar (including the litigants) were called as witnesses and gave somewhat varying opinions upon the question at issue, i. e., whether any commonly recognized custom prevails among them to render professional service to each other without compensation or the expectation of compensation. The most that can be said of the testimony, taken as a whole, is that it shows that the rendition of such services, free of charge, is a courtesy which is usually extended, between personal friends, engaged in active practice, where the service rendered or to be rendered does not involve an unusual expenditure of time or labor. Mr. Alexander, who had been engaged in the practice for 47 years, testifies that he has never made a charge against a brother local attorney, and that, so far as he knows, such charges are not customary. He says:
“It is a courtesy, of course; but I understand that the same courtesy is extended in all of the professions.”
Being asked whether the courtesy is extended, as a custom, to nonresident attorneys, he replied that he does not know that it is. Being asked whether, in using the word “attorney,” he included those who are members of the bar but are not engaged in the active practice of the law, he replied:
“That might affect the question somewhat, but I really do not know.”
He was then asked:
“Mr. Alexander, assuming that the facts recited in paragraph 3 of the petition are correct, assuming that Mr. Slattery rendered no material assistance to Messrs. Thigpen & Herold in the litigation, and assuming that there were no particular friendly relations between Mr. Slattery and Messrs. Thigpen & Herold that would give Mr. Slattery a claim upon Messrs. Thigpen & Herold for services without charge, beyond the fact of their both being members of 'the Shreveport bar, would you say that, in this case, the custom of courtesy to which you refer, would apply? I will ask you, in answering this question, to take into consideration Mr. Slattery’s wealth, the value of the property, which is admitted to be $40,000, and the fact that Mr. Slattery has not been in active practice for a number of years?”
*715 To which he replied:
“I could only say that there might be circumstances that would justify a disregard of such a custom among the members of the profession. I cannot answer that question at all satisfactorily, except as to myself, where, personally, I would not — and I think it would be a matter for the parties who rendered the services to take all those matters into consideration and do what they thought was right and proper.”
The re-examination and recross-examination proceed as follows:
“By Mr. Slattery:
“Q. If it is the custom of the Shreveport bar for attorneys to represent each other, free of cost, would you say that the services^ rendered^ as set forth in paragraph 3 of plaintiffs’ petition were such as to take them out of that custom? A. I could not say that it was; I do not know. Q. In other words, Mr. Alexander, has the custom of charging brother attorneys been confined to small and unimportant matters, or to matters, generally, in which the attorneys were personally interested? A. Well, I do not think the amount involved has “(anything)” to do with the charge for services; simply the ethics of the case. The rule being, as I understand the custom to have been, that attorneys make no charge for their services rendered a brother attorney.
“By Mr. Goldstein (attorney for plaintiffs):
“Q. Mr. Alexander, in the course of your practice, can you recall a single instance in which services of the magnitude of those set out in article 3 of the plaintiffs’ petition were ever rendered without charge, out of friendship to another, even in cases where the practitioner rendering the services was a close personal friend of the attorney to whom the services were rendered? A. I do not recall such a case. As a matter of course, in my experience, an attorney who became involved in litigation, personal to himself, would naturally go to his friends for services to be rendered to him in the case.”
The foregoing is about the strongest testimony that we find in support of the defense here set up. Other practitioners of long experience were called, and among them Judge Blanchard, at one time a member of this court and, prior to that, a partner of Mr. Alexander whose testimony has been quoted. I-Ie testifies, in part, as follows:
“Well, there is a courtesy among attorneys by which, ofttimes, as a general thing, they do not charge one another. I would judge it is more of a courtesy. I don’t know that it is (there is) a custom, I don’t think there is, that would bar an attorney from making a charge in a case like this — involving so many years of litigation — and prevent them (him) from charging a brother attorney for services rendered. I can illustrate. Blanchard & Smith defended a suit of considerable magnitude which took a week to try in the district court, for Mr. Baker, at Vivian, who is also a member of the bar. When we came to examine the facts, we considered that he was not actively a member of the bar, though he was a member of the bar and had some practice here; so he could have claimed the courtesy of the fee, though he never claimed it. Q. Has Mr. Slattery, the defendant in this case, been actively engaged in the practice of law for some years? A. No, sir; I have looked upon him more as a business man, with large property holdings, looking after his own affairs, more than I have looked upon him as a lawyer, for many years past. * * * Q. If you had rendered to Mr. Slattery, during the time these services were rendered, the same service that Thigpen & Her-old rendered, would you have made a charge for it? A. I certainly would. Q. Would it have been unreasonable to have expected to have charged him a fee? A. I would have expected Mr. Slattery to have paid me a fee. I wish to add, to the last remark I made, that I don’t think courtesy or whatever custom prevails through it, or by it, should ever govern what one lawyer should charge another. I think it would depend upon the circumstances of the case. In this instance, I would consider Mr. Slattery more as a business man, with large property interests, than I-would a practicing lawyer.”
Judge Pugh, a practitioner of long experience, called as a witness for defendant, gave the following, with other, testimony (on direct examination):
“Q. Is it customary for attorneys to charge each other for representing them before the courts? A. Not in ordinary matters. What little experience I have had in it, the attorney interested generally does all the work and gets some lawyer to kind of aid him, and sign for him. That is about the only experience that I have ever had with it.”
On cross-examination:
“Q. Do you know of any custom at this bar, or at any other bar, by which a firm of attorneys would be expected to render the services as rendered in this case without compensation? A. No, sir.”
Mr. Thigpen, of the plaintiff firm, says in his testimony:
“With the exception of what we call the Perry Lake litigation, I think this matter (referring to the litigation for which the fee is charged) has taken more of Mr. Hefold’s time than any matters that we have had since 1910. I think that he has put more time on this case and gave it *717 more attention, gave it as much attention and as careful attention, as if it had been his own case, instead of Mr. Slattery’s.”
It otherwise appears that $1,300 was remitted to an attorney in Washington City, of which one-third was returned to plaintiffs and has been credited by the judge a quo on the $2,500 claimed, which charge, as thus allowed, is fully sustained by the evidence.
Opinion.
[1] There is, no doubt, a rule of courtesy among the members of the bar, as among members of other professions, agreeably to which each will render services to the other without expectation of reward other than such as may come by way of similar service, and a case might, perhaps, be presented in which that rule would be applied as the law which should govern it; but the facts and the evidence disclosed by the record do not authorize the conclusion that this is such a case. The courtesy of a profession is not to be Strained to meet the demand of one who, having practically withdrawn from the profession and thereby disabled himself from reciprocating in kind, demands the courtesy as an aid to the accumulation of wealth in another pursuit; and, if the defendant herein availed himself of plaintiffs’ services upon the assumption that no charge w¡ould be made for them, he has himself, alone, to blame, for the evidence fails to show any such relation between him and plaintiffs or any such custom as would authorize that assumption.
[2] Mr. Alexander, defendant’s strongest witness, when presented with the facts of the concrete case disclosed by the record, and asked whether he would say that the custom of courtesy to which he had referred should be applied thereto, made answer:
“I could only say that there might be circumstances that would justify a disregard of such a custom among the members of the profession. I cannot answer that question at all satisfactorily, except as to myself, where I would not, and I think it would be a matter for the parties who rendered the services to take all those matters into consideration and do what they thought was right and proper.”
In other words, that, although he had a fixed opinion whereby he regulated his own conduct, he was unable to say that he knew of any rule or custom which, under all circumstances and in all cases, should govern the conduct of others, and that, in the case presented, it would be the proper thing “for the parties who rendered the service to take all those matters (i. e., all the facts and circumstances of this particular case) into consideration and do what they thought was right and proper.”
And that is the view that we take of it, and that was taken by the trial judge; and we concur in his conclusion that the course pursued by plaintiffs is justified by the matters which they were entitled to consider.
The judgment appealed from is therefore
Affirmed.

 126 La. 120, 52 South. 238.